NATIONAL MUTUAL CAS. CO. v. BRITT et al.

No. 33030.  Nov. 23, 1948.

Rehearing Denied Feb. 1, 1949.

Second Petition for Rehearing Denied June 6, 1950.

*200 P. 2d 407; 218 P. 2d 1039.*

Hudson, Hudson, & Wheaton, of Tulsa, for plaintiff in error.

Frank Nesbitt and Nelle Nesbitt, both of Miami, for defendants in error.

WELCH, J. At the times material to this action the plaintiffs, Carl M. Britt and Glen Delbert Britt, a copartnership doing business as Britt Milling Company, carried an insurance policy with the defendant, the National Mutual Casualty Company, a corporation. The defendant, as insurer, agreed to indemnify plaintiffs against all liability imposed by law for damages on account of injuries to plaintiffs' employees, but not in excess of $5,000 as to any one employee.

On October 9, 1941, one James Doty, an employee of the plaintiffs, was caught under a slide of chats and smothered to death. Thereafter Mayme Doty, as administratrix of the estate of James Doty, deceased, filed suit and recovered a judgment against the plaintiffs for $10,000. The defendant herein conducted the defense of that suit in the name and behalf of the plaintiffs herein. The judgment became final; Britt et al. v. Doty, Adm'x, 195 Okla. 620, 161 P. 2d 521, and was paid, one-half by the plaintiffs herein and one-half by the defendant herein.

Plaintiffs brought this action in damages against defendant seeking judgment for $5,000, the amount over the policy limit, which plaintiffs paid on the judgment, charging that defendant acted in bad faith in refusing to accept offers of compromise and settlement for amount less than the policy limit made by the administratrix and that in the conduct of the defense of the suit the defendant acted in bad faith.

The defendant made denial of all charges of bad faith and asserted faithful performance of all the terms of the policy. Verdict was returned in favor of plaintiffs and against the defend-

ant for the sum of $5,000 and judgment was entered thereon, and defendant brings this appeal.

The record discloses that on and prior to October 9, 1941, plaintiffs operated a mill for the extraction of the mineral content of chats and tailings. The chats were hauled in trucks from a chat pile which was about two miles from the mill. The trucks were operated for plaintiffs by James Doty, Fred Holt, and Henry Wade. These trucks were loaded at the chat pile by a power shovel which was operated by Leroy Wade, plaintiff's foreman at the chat pile. Joe Nolan was employed by plaintiffs as powderman, to set and fire shots of explosives in the chat pile to cause chats to slide down from the top of the pile within reach of the dipper of the loading shovel.

On the morning of October 9, 1941, an old drill casing was sticking out of the ground near the shovel and within a few feet of the chat pile. An explosive charge was placed around the casing and at about the same time a shot was set high up in the chat pile. After these charges had been exploded Holt and Doty walked to the casing and shortly thereafter a chat slide occurred which caught and killed Doty. The employees above named were the only persons in the vicinity of the chat pile at the time.

Following the death of Doty these other named employees, as requested, went to the office of an attorney for the defendant and were interviewed and signed written statements. All the statements were of similar import and there were no conflicts in the statements. The statement signed by Fred Holt read in part as follows:

"Sometime shortly after nine this morning my truck stopped a short distance northeast of the shovel at the tailing pile, Joe Nolan was fixing a shot at a casing just west of the shovel, the shot Nolan was fixing was to cause tailings to slide toward the shovel. After the shots went off we waited a few minutes until smoke cleared, then Le-

Roy Wade, shovel operator, moved shovel toward tailing pile and Doty and myself went to the casing which was about 3 or 4 feet west of the shovel, we went of our own accord just out of curiosity, while we were waiting to get our trucks loaded. Henry Wade was to load first. Before first shovel full was picked up shovel operator pushed the old casing with shovel, this was just before Doty and me went to casing.

"When we went to casing just West of shovel the tailings were about six feet south of casing, Doty and me looked at casing, pushed on it and I was just north of casing, Doty just south of it. I looked up and saw tailings sliding towards us. I hollered 'My God, Jim, run.' I ran north and looked back and saw tailings strike Jim Doty below knees, throw him down and he was covered completely up. . . .

"During time I worked with Jim Doty we saw several slides at this tailing pile and we both knew it was dangerous to be near edge of tailings when the slides happen. We also knew that sometimes tailing did not slide much at shot and then in few minutes there would be larger slide. Carl Britt had told me and I heard him tell Jim Doty to watch out for slides and keep away from tailing slides as he would rather get a shovel or truck covered up than to get a man hurt. He told us this at different times one time I remember was about a month ago."

On August 13, 1942, the administratrix of James Doty, deceased, filed suit against the plaintiffs for damages, alleging deceased had no knowledge of shots having been fired in the chat pile and charging negligence in the failure to warn the deceased about the shots and the resulting dangerous condition of the chat pile and the impending probability of a slide.

On August 23, 1942, the deposition of LeRoy Wade was taken. He was cross-examined by the attorney who had received the written statement from him the evening of Doty's death. Wade testified that after the shots were placed around the casing and up on the chat pile and just before they were exploded he loaded Doty's truck and Doty drove away; that a round trip to the mill was usually made by the trucks in about 15 minutes. That the slide which buried Doty occurred about seven or eight minutes after the shots exploded.

On August 26, 1942, and on November 25, 1942, an amended petition and a second amended petition was filed by the administratrix. The charge of negligence against plaintiffs as pleaded in the second amended petition, was that plaintiffs' employees had fired shots in the chat pile during the absence of Doty, which shots had failed to knock the chats down at the time of the explosion, but had loosened them; that Doty knew nothing of that fact and when he returned to the chat pile he was not warned thereof. The petition set forth the age, earning capacity, life expectancy of the deceased, and the contributions he had made to the administratrix and asserted pecuniary loss of $21,600.

On April 2, 1943, the deposition of Fred Holt was taken wherein he testified that Doty was not present at the time the shots were discharged and was not told of the shot having been fired in the chat pile.

The case between the administratrix and plaintiffs was tried on May 25, 1943, with the result hereinbefore noted.

Herein the pleadings, instructions given and mandate in that case were introduced in evidence, together with a transcript of the testimony given in that case by LeRoy Wade and Henry Wade.

The insurance policy, the written statement of Fred Holt, and the deposition of Fred Holt were introduced in evidence herein, and Joe Nolan, LeRoy Wade and Henry Wade each testified in this case and to the effect that Doty was not present when the shots were fired and had not been told that the shots had been fired. The plaintiff Carl Britt testified that on the day of Doty's death and a short time thereafter, a general agent of the defendant company told him to make no effort

toward settlement of any claim and to keep his nose out of it; that there was no liability. That three or four months after Doty's death the funeral director told him the case could be settled for $1,700 to $1,800, and he reported the statement of this third person to the adjuster of the defendant company. That thereafter and before a suit had been filed, he and an attorney for the defendant had a conversation with the attorneys for the administratrix who told them that they had been employed to file suit and that the case could then be settled for $3,900.

That after the suit had been filed by the administratrix an offer of settlement within the policy limits was made to the plaintiff Carl Britt. Britt advised the president of the defendant insurance company of the offer and was told to tend to his mining business and the company would tend to the insurance business. On the morning of the day the case was to be tried the attorney for the administratrix made an offer to settle for approximately $4,900 to the defendant's attorney.

It is contended by defendant that the evidence presented by the plaintiffs is insufficient to establish a prima facie case of bad faith against the defendant; that the trial court erred in overruling the demurrer to the evidence.

It is conceded that an insurer, such as defendant herein, may so conduct itself as to be liable for an entire judgment recovered against an insured even though the judgment exceeds the amount of liability named in the policy. The following apt expression from this court is found in the opinion in the case of Boling v. New Amsterdam Casualty Co., 173 Okla. 160, 46 P. 2d 917:

"It may be stated as a rule of law that where an insurance company agrees to indemnify against loss from personal injury claims, conditioned upon insured's surrendering to the insurance company control of investigations, adjustments of claims, and defenses of lawsuits, and where the insurance company does, pursuant to such contract, take control of such matters, a relationship arises between insured and insurer which imposes on the insurer the duty owing to the insured to exercise skill, care, and good faith to the end of saving the insured harmless as contemplated by the contract to indemnify. The insurer must act honestly to effectually indemnify and save the insured harmless as it has contracted to do, to the extent, if necessary, that it must make whatever payment and settlement an honest judgment and discretion dictate, within the limits of the policy, and an abandonment of this duty to act subsequent to its assumption in part constituted bad faith. Maryland Cas. Co. v. Cook-O'Brien Const. Co., 69 Fed. 2d 462; Am. Mut. Liability Co. v. Cooper, 61 Fed. 2d 446; Maryland Cas. Co. v. Elmira Coal Co., 69 Fed. 2d 616; Bartlett v. Travelers Ins. Co. (Conn.) 167 Atl. 180. Contr; Rumford Falls Paper Co. v. Fid. & Cas. Co., 92 Me. 574, 43 A. 503."

Herein it was apparent that if there was any liability for the death of Doty it was far beyond the limits of the policy. After the suit was filed by the administratrix alleging a state of facts, which if proven would result in a judgment against plaintiff in excess of the policy limits, the defendant was bound to give the rights of the plaintiffs at least as much consideration as it did its own in determining whether or not to effect a settlement.

As was said in Douglas v. U. S. F. & G. Co. (N.H.) 127 Atl. 708, 37 A.L.R. 1477:

"An indemnity insurer who stands to lose only a part of a litigated claim in case he refuses to settle it, while the insured stands to lose the balance, is bound to give the rights of the insured at least as much consideration as it does its own in determining whether or not to effect a settlement."

In Johnson v. Hardware Mut. Casualty Co., 109 Vt. 481, 1 Atl. 2d 817, bad faith was alleged in the refusal to accept an offer of settlement. In the court's opinion we note this expression:

"When the company accepted the premium charged for the policy, it im-

pliedly undertook to use this control and management for the mutual benefit of the parties to the contract. Their relations became mutually fiduciary; and each owed the other the duty of the utmost good faith in their dealings together, and in exercising the privileges and discharging the duties specified in and incident to the policy contract. The plaintiff engaged to co-operate with the company if a loss threatened. He was bound to do so honestly and with all good fidelity. The company was equally bound so to handle the Rule Case. It had a right to look after its own interests, but it was bound to have due regard for the plaintiff's interests, as well. If in what it did and refused to do, it acted honestly and according to its best judgment, this suit must fail. If on the contrary, it used its authority over the case of Rule v. Johnson, supra, to save itself from as much of the loss as possible, in disregard of the plaintiff's rights, consciously risking loss to the plaintiff to save loss to itself, the suit must succeed; for that would be bad faith, while its relation to the plaintiff demanded good faith. As applied to this case, bad faith on the part of the defendant would be the intentional disregard of the financial interests of the plaintiff in the hope of escaping the full responsibility imposed upon it by its policy."

Herein, if the defendant used its authority over the case of the administratrix against the plaintiffs with an eye solely to its own interests and in disregard of plaintiffs' interests, it was guilty of bad faith.

It was the right of the defendant to exercise its own judgment upon the question of whether the claim should be settled or contested, but its decision must be in good faith and with consideration of the interests of plaintiffs. It should be the result of the weighing of probabilities in a fair and honest way after obtaining the facts upon which liability is predicated.

We do not go so far as to say that in every instance where there exists a possibility of a verdict against the insured and the nature of the injuries are such that in the event of such verdict in all probability it will exceed the policy limits, a refusal by the insurer of an offer of settlement within the policy limits constitutes bad faith. But under such circumstances a decision to contest the claim should be subjected to close scrutiny for, if based on a mere chance that the claim might be defeated and not on a bona fide belief that the action will be defeated, a refusal of such an offer of settlement would not be good faith.

When the administratrix filed suit against plaintiffs she predicated her charge of negligence on an extraordinary hazard of which she claimed Doty had no knowledge or warning. The crucial question in that suit was whether or not Doty was present when shots were fired in the chat pile a few minutes preceding the slide that caused his death, or was warned that shots had been fired and chats had been loosened.

After the depositions of the persons present at the time of the death of Doty had been taken, and they had testified with more particularity than in the statements given to the defendant and to a state of facts supporting the allegations of negligence, defendant in its own interest and in the interest of plaintiffs was bound to have given consideration to the possibility of a verdict against plaintiffs.

The only evidence available in defense were such inferences of knowledge of the danger by the deceased as might be drawn from the facts and circumstances as set out in the prior statements of these witnesses of which their depositions were explanatory and more in detail.

Under these circumstances, when viewed in a light most favorable to plaintiffs, it might with reason be said that defendant knew it had no more than an equal chance of success in wholly defeating the action, and that there was no chance of a verdict within the policy limits.

In this view, the defendant acted to save itself from as much loss as possi-

ble, in disregard of the plaintiffs' interests, consciously risking loss to the plaintiffs to save loss to itself.

The demurrer was properly overruled.

Defendant contends "the court erred, in giving in his instructions, the statement of the case."

In instruction 1, the court sets out a statement of the claims and contentions of the parties as set forth in the pleadings.

Defendant complains that references are made in the statement of the failure of defendant to advise plaintiffs of the status of the case or how the same was proceeding, and asserts that the defendant, acting under the policy, was under no duty to keep plaintiffs advised; that the statement to the jury calls attention to a contention that there was an inadequate investigation of the facts made by defendant on which to predicate its action on the compromise offer; that these references in the statement to charges of negligence were unwarranted and unsupported by evidence and error was committed in discussing with the jury issues of fact not actually existing in the case.

In instruction No. 3, it is noted that the trial court advised the jury of the rights and duties of defendant in reference to control and management of the case under the terms of the policy.

Under the general charge of bad faith, plaintiffs in their petition set forth what they alleged to be all the acts and conduct of defendant and plaintiffs in reference to the case from the time of the death of Doty until final judgment.

After setting forth the allegations of the petition, the court in subsequent and separately numbered paragraphs submitted the issues of bad faith. In so far as the acts of the defendant alleged by plaintiffs constituted charges of negligence, such charges of negligence were included in the overall charge of bad faith.

The evidence presented concerning preparation and knowledge of available defense was a proper part of the proof upon the issues of bad faith. We are of the opinion that the defendant's rights were not prejudiced by the setting out of all the claims of plaintiffs in reference to defendant's conduct preceding the submission of the issues of bad faith and a declaration of the law applicable thereto.

Defendant next asserts "the court erred in giving instruction No. 3." Instruction No. 3 is as follows:

"The insurance company, defendant herein, under the terms of its policy had an absolute right to dispose of the action brought against the plaintiff, its assured, and by the plaintiff turned over to it to defend under the terms of the policy, and it had the option to settle it in such a way as may appear to it for its best interests. It is not bound to consult the interest of the assured to the prejudice of its own interest in case of conflict between the two, except that in case where a judgment is probable against the insured and the likelihood of winning the case for the insured is slight, or the likelihood of a judgment, if any, against the assured being within the limitations of the policy (in this case, $5,000) is slight, which facts are actually known to the insurer, being the insurance company herein, and the insurance company actually knows that to be true, and the insurance company further knows that a judgment for more than five thousand dollars is probable if the case goes to final judgment, which would result in the insured being held liable for the judgment in excess of the policy, to wit: five thousand dollars, and said insurance company is guilty of bad faith towards the insurer in refusing to settle the case for less than five thousand dollars, if such opportunity existed, in a reckless disregard of the insured (plaintiffs) rights and that failure to employ good faith was the approximate cause of the damage herein, then the plaintiff could recover."

Defendant here complains that:

"The trial court in substance in the foregoing instruction told the jury that

where it appeared probable that the plaintiff would recover judgment in excess of the limits, the insurance company was guilty of bad faith toward the insurer in failing to settle the case for less than the limits."

The instruction advised the jury that if defendant was guilty of bad faith and acted in a reckless disregard of the plaintiffs' rights in refusing to settle the case for less than the policy limits, the plaintiffs could recover. Such is the law. Boling v. New Amsterdam Casualty Co., supra.

In so far as the instruction may be said to define and apply the term "bad faith," the limited construction placed on it by defendant is not justified. The jury was told that where it appeared probable that a judgment against plaintiffs would be recovered in excess of the policy limits and defendant knew the likelihood of winning the case for plaintiffs was slight, and the defendant was guilty of bad faith in refusing an offer of settlement within the limits, plaintiffs could recover.

As was said in the body of the opinion in Wisconsin Zinc Co. v. Fid. & Dep. Co. of Md., 162 Wis. 39, 155 N. W. 1081, Ann. Cas. 1918C, 399:

"While the defendant had the right to consult what it deemed to be its own interest in making a settlement, it could not abuse the power vested in it and recklessly and contumaciously refuse to settle if it was apparent that in all reasonable probability its conduct would not only result in damage to the plaintiff but also in loss to itself."

In City of Wakefield v. Globe Indemnity Co., 246 Mich. 646, 225 N. W. 643, we note this expression:

"On the other hand, arbitrary refusal to settle for a reasonable amount, where it is apparent that suit would result in a judgment in excess of the policy limits, indifference to effect of refusal on the insured, failure to fairly consider a compromise and facts presented, and pass honest judgment thereon, or refusal upon grounds which depart from

the contract and the purpose of the grant of power, would tend to show bad faith."

We are of the opinion that the instructions given did not mislead the jury or place a higher duty upon defendant than was required by law, but fairly stated the law applicable to the evidence presented.

Defendant asserts, "the court erred in giving instruction No. 4." It is urged that the instruction has no application to the issues here involved. Its correctness as an abstract proposition of law is not challenged.

The instruction defines the term, "proximate cause of an injury," in the form and language usually found in instructions given in a personal injury suit. It does not submit an issue of fact and it does not appear that the instruction misled the jury in its consideration of the case. Under the circumstances, the giving of this instruction was not reversible error. Buck Creek Coal Mining Co. et al. v. Johnson, 198 Okla. 664, 181 P. 2d 1003.

Judgment affirmed.

HURST, C.J., and RILEY, BAYLESS, and CORN, JJ., concur. ARNOLD, J., dissents.

---

ARNOLD, V.C.J. (dissenting). This case arose out of the facts and circumstances considered and passed upon by this court in the case of Britt et al. v. Doty, Administratrix, 195 Okla. 620, 161 P. 2d 521. That was an appeal from wrongful death verdict and judgment. At all times material to this action the plaintiffs, Carl M. Britt and Glenn D. Britt, were a partnership doing business as Britt Milling Company and carried an insurance policy with the defendant, the National Mutual Casualty Company, a corporation. The defendant as insurer agreed to indemnify plaintiffs against all liability imposed by law for damages on account of injury to or death of plaintiffs' employees,

but not in excess of $5,000 as to any one employee. Its contract further bound the company to investigate all claims arising under its contract and to defend all actions resulting therefrom.

On October 9, 1941, James Doty, an employee of plaintiffs, was accidentally killed by a slide in a chat pile caused by the explosion of dynamite shots placed in the chat pile by another employee of plaintiffs. The company, pursuant to its obligation under its contract, conducted an investigation of the facts and circumstances attending the accident and conducted the defense of the action brought by Mayme Doty as administratrix of the deceased against the Britts and the company.

In the instant action, plaintiffs sought judgment against the insurance company in the sum of $5,000, the amount in excess of the policy limit which plaintiffs paid on the judgment in the Doty case. The claim on which plaintiffs' action is based is that the company acted in bad faith in the investigation and defense of the prior action and in refusing to make a settlement of that action within the limits of its policy when the opportunity to do so was offered it.

Admitting the partnership of plaintiffs and its own corporate existence, defendant denied generally and specifically each and all of the material allegations of plaintiffs' petition.

In presenting the case to this court for review the principal contention of defendant and the burden of its argument is that the evidence is insufficient to establish and show bad faith on its part in the discharge of its obligations to plaintiffs under its indemnity contract.

Both parties in their briefs cite and quote excerpts from the case of Boling v. New Amsterdam Casualty Co., 173 Okla. 160, 46 P. 2d 916. In the Boling case the lower court sustained a demurrer to plaintiff's amended petition, dismissed her action, and this court in reviewing that judgment held that the allegations were sufficient to state a cause of action in tort. Those allegations showed that after a judgment was obtained against Boling and her insurance company for $20,000, the plaintiff in that action offered to settle her claim and enter full satisfaction of the judgment for the sum of $6,000 if paid within a specified time; that Boling communicated this offer to the company which refused to make the settlement on that basis unless Boling would pay $4,500 of the $6,000 settlement which in effect would release the company of its liability under its contract to the extent of $3,500. When plaintiff in that action refused to accede to this demand by the company, it failed and refused to appeal that case to this court for review. Plaintiff in that case alleged that under these demands the refusal to appeal by the company was arbitrary, oppressive, and in violation of its obligations under its contract and constituted bad faith. These allegations of fact being admitted by the demurrer the action of the trial court in dismissing the action was held by this court to be erroneous and its judgment was reversed.

In the instant case the record discloses that immediately upon learning of the accident, defendant notified Carl M. Britt to have all witnesses to the accident at the office of its attorney that evening. Pursuant to that notice Mr. Britt and all of the employees engaged in work at the scene of the accident were present at the attorney's office and were carefully interrogated by the attorney as to all of the facts and circumstances showing how the accident occurred and their several statements were reduced to writing by the attorney and each of said witnesses signed the same. There is practical unanimity in these statements which omit only one important detail, which is a direct statement of the presence of Doty, the deceased, at the time the shots in the chat pile were discharged. On the basis of these statements signed by the witnesses within a few hours after the accident happened, the attorney ad-

vised the company that no negligence was shown on the part of the Britts and that no liability against them resulted from Doty's accidental death. The attorney so acting for and advising the company was one of long experience in the practice of law in Oklahoma.

Subsequent to this preliminary investigation by the attorney for defendant and after suit was filed on August 13, 1942, the depositions of these same witnesses were taken by the attorney for the administratrix, and while their testimony by deposition was in greater detail as to facts and circumstances than shown in their signed statements, the substance of their testimony was the same as their statements except that it was shown that when the shots were fired in the chat pile Doty, the deceased, was on his way to the mill with a truckload of chat and was not present when the shots were fired and when the first slide following the shots occurred, and that when he did return after an absence of some ten or fifteen minutes, he was not advised by any of his fellow employees that the shots in the chat pile had been fired.

Evidently Doty knew the shots had been fired because Fred Holt in his deposition testified that upon his return from the mill Doty left his truck and came directly to the witness and, as they walked to the west side of the shovel, Doty said: "Let's try to break this off here so we can back in on this side." LeRoy Wade, the foreman, testified that Doty helped him place the shot around the casing before leaving for the mill. Joe Nolan, the powder man, testified that upon Doty's return from the mill some 100 to 150 tons of chat had come down following the shots and that the face of the pile had changed considerably; that he did not tell Doty nor hear anyone else tell him that the shots had been fired, but "I surmised he knew it. He could tell some had been shot down." All of the witnesses agree that the three truck drivers, Doty, Fred Holt, and Henry Wade, were experienced men in the work they were doing and knew the danger of getting too near the chat pile after shots had been fired therein. Fred Holt testified that Carl Britt had personally warned him and Doty to stay away from the pile as he did not want a man to get hurt. LeRoy Wade, the foreman, testified that he had personally warned all of the trucks drivers of the danger of getting too near the pile after shots were fired.

In viewing and evaluating the decision of the company to resist the claim of the administratrix this may not be done from the vantage point established by the subsequent verdict and judgment in the Doty case. Like the case of a man charged with manslaughter, who pleads self-defense, the facts and circumstances must be viewed from the standpoint of the defendant at the time it made its decision to resist the claim. When the record in the Doty case was reviewed by this court, the facts and circumstances shown therein preceding and attending the accident caused this court, in its opinion, to make two significant observations. It said:

"The testimony is in irreconcilable conflict as to when Doty left. Fred Holt testified for the plaintiff stating that Doty left before the shots were fired. The testimony of witnesses for defendant is to the contrary."

Again:

"The evidence is in serious conflict as to whether Doty was there at the time the shots were fired."

If this court in reviewing that record found reason to hesitate in determining the weight and value of the evidence upon a vital issue in the case, certainly the defendant, viewing the same facts and circumstances prior to the verdict of the jury, could not be guilty of bad faith in making the decision which it did make. Not only so, but on August 31, 1942, the company wrote a letter to Britt Milling Company advising it that the suit had been filed for damages in the sum of $46,600 and that the company had employed

Mr. McNaughton to defend the suit. It further advised the Britt Milling Company that if it desired to have an attorney participate in the trial in its behalf it would find Mr. McNaughton very co-operative. Bad faith is the antithesis of good faith and our Legislature has told us in statutory language what constitutes good faith. In 25 O. S. 1941 §9, we are told:

"Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transactions unconscientious."

In the case of Sapulpa Petroleum Co. v. McCray, 136 Okla. 269, 277 P. 589, this court said in speaking of good faith:

"It is the opposite of fraud and its nonexistence must be established by proof."

On this appeal we are not concerned with the merit or lack of merit in the damage action of Doty's administratrix, but the sole question for determination here is the good or bad faith of the present defendant in what it did or omitted to do in the discharge of its contractual obligation to the present plaintiff in the Doty case. Its decision at that time, whether wise or unwise, cost it eventually $2,270 in excess of its contractual obligation, so that considerations of self-interest may not be inferred as having influenced its decision.

Since both the parties to this appeal quote and rely on the rule of law announced in the Boling case, supra, it is apparent that the primary issue here involved is the existence or absence of bad faith on the part of defendant in its conduct of the defense in the Doty case, and that authorities based on negligence are inapplicable because the basis for the rule announced in the Boilng case is thus stated in that opinion:

"The action at bar is predicated on bad faith, which is a thing apart from self-interest and renders unnecessary consideration of the cases based on negligence. Insurer's rejection of the offer to settle because insured would not assume a part of its contractual liability would support a conclusion of bad faith. American Mut. Liability Ins. Co. of Boston, Mass., v. Cooper (C.C.A.) 61 Fed. (2d) 446. Especially when coupled with failure of insurer to either defend the original suit on appeal or settle to the extent of its then liability."

Based upon this statement the rule announced in that case reads:

"It may be stated as a rule of law that where an insurance company agrees to indemnify against loss from personal injury claims, conditioned upon insured's surrendering to the insurance company control of investigations, adjustments of claims, and defenses of lawsuits, and where the insurance company does, pursuant to such contract, take control of such matters, a relationship arises between insured and insurer which imposes on the insurer the duty owing to the insured to exercise skill, care, and good faith to the end of saving the insured harmless as contemplated by the contract to indemnify. The insurer must act honestly to effectually indemnify and save the insured harmless as it has contracted to do—to the extent, if necessary, that it must make whatever payment and settlement an honest judgment and discretion dictate, within the limits of the policy, and an abandonment of this duty to act subsequent to its assumption in part constituted bad faith."

Plaintiff's action in the Doty case sought recovery of damages in the sum of $46,000 and the only definite offer of settlement was made on the day that case was set for trial and was for the sum of $4,900. It is small wonder that defendant's attorney felt that his view of the adducible evidence in that case was shared by the attorney for the administratrix and that his belief in the nonliablity of the Britts was substantially confirmed by this offer. The subsequent trial and determination in that case showed his judgment in this respect to have been erroneous, but an error of judgment as to the

effect on a jury of conflicting evidence is not an indication of bad faith in entertaining such opinion. As was said in Georgia Casualty Co. v. Mann, 242 Ky. 447, 46 S. W. 2d 777:

"The facts were investigated, the evidence on the question of liability was conflicting, and the most that can be said is that in refusing to settle the insurance company committed a mere error of judgment for which it cannot be held liable."

In Mendota Elec. Co. v. New York Ind. Co., 175 Minn. 181, 221 N. W. 61, the court used this language:

"It takes something more than mere mistake to constitute bad faith, particularly with respect to the action of an insurer under a policy of public liability who is not absolutely bound to make a settlement. The right to control negotiations for a settlement must, of course, be subordinated to the purpose of the contract, which is to indemnify the insured within the contract limit. But it takes something more than error of judgment to create liability. There must be bad faith with resulting injury to the insured before there can be a cause of action."

A case very similar to the one at bar is that of Lawson & Nelson Sash & Door Co. v. Associated Ind. Corp., 204 Minn. 50, 282 N. W. 481. Quoting from that opinion and substituting the names of the attorneys in the Doty case for the names of the attorneys mentioned in that case:

"The most that can be said about the whole situation retrospectively is that Mr. Commons' judgment was better than that of Mr. McNaughton's, i. e., it would have been better for all concerned if the proposed settlement had been made effective. But, after all, no mortal has the gift of prophecy. In so far as any standard of due care could be applied to the exercise of honest judgment, we think the result justified no other conclusion than that reached by the trial court."